# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |
|---|---|
| **Decapolis Systems, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MedSys Group, LLC, Tenet Healthcare Corporation, Universal Health Services, Inc., and Tyler Technologies, Inc.,**<br><br>**Defendants.** | **Case No. 2:22-cv-146**<br><br>**Jury Trial Demanded** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Decapolis Systems, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against MedSys Group, LLC ("MedSys"), Tenet Healthcare Corporation ("Tenet"), Universal Health Services, Inc. ("UHS"), and Tyler Technologies, Inc. ("TTI," and collectively, "Defendants"), and alleges, upon information and belief, as follows:

## THE PARTIES

1. Decapolis Systems, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at: Decapolis Systems, LLC, 600 S. Dixie Hwy, #605, West Palm Beach, Florida 33401.

2. Upon information and belief, Defendant MedSys Group, LLC is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 5465 Legacy Drive, Suite 550, Plano, Texas 75024. On information and belief, Defendant may be

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

served through its registered agent in the State of Texas: Nancy Ellefson, 5465 Legacy Drive, Suite 550, Plano, Texas 75024.

3.     Upon information and belief, Defendant Tenet Healthcare Corporation is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 14201 Dallas Parkway, Dallas, Texas 75254.   On information and belief, Defendant may be served through its registered agent in the State of Texas: C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

4.     Upon information and belief, Defendant Universal Health Services, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 367 South Gulph Rd., King of Prussia, PA 19406.  On information and belief, Defendant may be served through its registered agent in the State of Texas: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701.

5.     Upon information and belief, Defendant Tyler Technologies, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 5101 Tennyson Parkway, Plano, Texas 75024.  On information and belief, Defendant may be served through its registered agent in the State of Texas: CAPITOL CORPORATE SERVICES, INC. at 206 E. 9th Street, Suite 1300, Austin, TX 78701.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

7.     This Court has personal jurisdiction over Defendants.  Defendants have continuous and systematic business contacts with the State of Texas.  Defendants transact business within this District and elsewhere in the State of Texas and has appointed an agent for service of

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT          2

process in Texas. Further, this Court has personal jurisdiction over Defendants based on their commission of one or more acts of infringement of Decapolis' Patents in this District and elsewhere in the State of Texas.

8.      Defendants directly conduct business extensively throughout the State of Texas, by distributing, making, using, offering for sale, selling, and advertising (including the provision of interactive web pages; the provision and support of physician networks; the provision and support of customer accounts; and further including maintaining physical facilities) its services in the State of Texas and in this District.  Defendants have purposefully and voluntarily made their business services, including the infringing systems and services, available to residents of this District and into the stream of commerce with the intention and expectation that they will be purchased and/or used by consumers in this District.  On information and belief, Defendants are providers of: (i) health services, (ii) billing services; (iii) physician and hospital account services; and/or (iv) patient records in electronic format, throughout the United States.

9.      On information and belief, Defendants maintain physical brick-and-mortar business locations in the State of Texas and within this District, retain employees specifically in this District for the purpose of servicing customers in this District, and generate substantial revenues from their business activities in this District.

10.     Venue is proper in the Eastern District of Texas as to Defendants pursuant to at least 28 U.S.C. §§ 1391(c)(2) and 1400(b).  As noted above, Defendants maintain regular and established business presences in this District.

**PATENTS-IN-SUIT**

11.     Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patents 7,464,040 and 7,490,048 (hereinafter collectively referred to as "the Decapolis Patents").

12.     By written instruments duly filed with the United States Patent and Trademark Office, Decapolis is assigned all rights, title, and interest in the Decapolis Patents.  *Id.* Such Assignments are recorded in the records of the United States Patent and Trademark Office at Reel 055516 and Frame 0027.  As such, Plaintiff Decapolis Systems, LLC has sole and exclusive standing to assert the Decapolis Patents and to bring these causes of action.

13.     The Decapolis Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

14.     Raymond A. Joao is the sole named inventor for the Decapolis Patents.

15.     Mr. Joao is a pioneering inventor. The Decapolis Patents represent substantial technological advancements in the medical billing services industry, which were unconventional at the time of invention.  Indeed, the Decapolis Patents have been back-cited in patents issued to well-known industry leaders, including: IBM, Siemens AG, Walgreens, McKesson, and Sony.

16.     Additional companies have benefited from, and been provided notice through, their back-citations to the Decapolis Patents, including: Atirix Medical Systems, Inc.; IBM Corp.; Bard Peripheral Vascular, Inc.; General Electric Company; C.R. Bard, Inc.; Healthunity Corp., Epic Systems Corp.; Accelere, Inc.; Align Technology, Inc.; Siemens Aktiengesellschaft; Vital Data Technology, LLC; Hospira, Inc.; Medical Present Value, Inc.; PSYWARE GmbH; ICU Medical, Inc.; Elwha LLC; Advanced Healthcare Systems, Inc.; Quality Standards, LLC; Therap Services, LLC; and Devicor Medical Products, Inc.

17.     The Decapolis Patents each include numerous claims defining distinct inventions.  No single claim is representative of any other.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    4

18.     The priority date of each of the Decapolis Patents is at least as early as December 18, 1999. As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.  Indeed, the Decapolis Patents overcame a number of specific technological problems in the industry, and provided specific technological solutions.

19.     By way of example, as of the date of invention, "Doctors or providers may base their diagnoses and/or treatments, [relying on] patients who usually supply this information on questionnaires or forms just prior to seeing the healthcare provider and/or during a preliminary interview with the provider." *See* U.S. Patent No. 7,464,040, Col. 1, ll. 52-6.  As a result, the "information obtained from these questionnaires or forms, as well as from these preliminary interviews with the providers, may not necessarily result in sufficient, comprehensive, and/or accurate, information being obtained regarding the patient." *Id.*, Col.1, ll. 56-60.  Further, as of the date of invention: "there is no guarantee that the same [patient medical history] information will be provided, in a uniform manner, to a next or different provider. As a result, patient information may not be uniformly distributed and/or be available to providers at the point of treatment and/or otherwise." *Id.*  "Another problem which exists in the current healthcare system is that doctors or other providers do not always have the latest information and/or research material available to them prior to, and/or during, the diagnosis and/or treatment process." *Id.*, Col. 1, ll. 60-5.

20.     Further, at the time of the invention, it had "been estimated that between 44,000 and 98,000 individuals die in the United States alone, as the result of errors or mistakes made by doctors, healthcare providers, and/or healthcare facility workers. There is no doubt that many of these deaths result from inaccurate and/or erroneous information and/or the lack of the availability of correct and/or up-to-date information." *Id.*, Col. 1, ll. 43-49.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          5

21.   The Decapolis Patents overcame these technological problems by a method or apparatus wherein a "medical doctor will transmit [a] final diagnosis and treatment plan…to [a] central processing computer" and wherein "the central processing computer [sic] will then update the patient's records in the database [sic] so as to include all of the data and information described as being processed and/or generated by the central processing computer [sic], including, but not limited to the patient's symptoms, if any, the examination findings, the information contained in the diagnostic report and the treatment report, the final diagnosis and the prescribed treatment. Thereafter, operation [sic] will cease [sic]. The patient's records will then be updated and be available for the patient's next treatment and/or diagnosis." *Id.*, Cols. 28, ll. 66-7 and Col. 29, ll. 10-2.

22.   The claims of the Decapolis Patents are patent eligible under 35 U.S.C. § 101, 102, 103, and 112, as reflected by the fact that three different Patent Examiners all agreed and allowed the Decapolis Patents over extensive prior art as disclosed and of record during the prosecution of the Decapolis Patents.  *See Stone Basket Innov. v. Cook Medical,* 892 F.3d 1175, 1179 (Fed. Cir. 2018) ("when prior art is listed on the face of a patent, the examiner is presumed to have considered it") (citing *Shire LLC v. Amneal Pharm., LLC,* 802 F.3d 1301, 1307 (Fed. Cir. 2015)); *Exmark Mfg. v. Briggs & Stratton,* 879 F.3d 1332, 1342 (Fed. Cir. 2018).

23.   Moreover, any arguments relating to eligibility as may be made by Defendant here are necessarily merely cumulative with those already considered, and rejected, by the Patent Examiners in allowing the Decapolis Patents.  *See, e.g., Technology Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1337 (Fed. Cir. 2008); *Stone Basket,* 892 F.3d at 1179.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                 6

24.     As further evidence of the unconventionality of the technological solutions captured in the claims of the Decapolis Patents as of 1999, the United States of America, Department of the Army even cites to the Decapolis Patents.

25.     As noted, the claims of the Decapolis Patents have priority to at least December 18, 1999.

26.     The claims of the Decapolis Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

27.     Further, the claims of the Decapolis Patents contain inventive concepts.  Even if a court ruled the underlying aspects to be abstract, the inventive concepts disclosed in sufficient detail would transform the claims into patent-eligible subject matter.

28.     The claims of the Decapolis Patents were investigated by the Patent Examiners in fields exactly relevant to the patented inventions.

29.     More specifically, the Patent Examiners performed for patent eligibility, including novelty, an analysis of the claims of the Decapolis Patents in at least the 600/300 (Diagnostic Testing), 705/2-4 (Health care management; Healthcare record management; and Patient record management), and 715/530 (Data Processing)

30.     As further evidence of the inventive nature of the inventions claimed in the Decapolis Patents, the Decapolis Patents each had at least 135 citations before being issued as valid and enforceable patents.

31.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United

States Patent Examiners allowed all of the claims of the Decapolis Patents to issue.  In so doing, it is presumed that Examiners used their knowledge of the art when examining the claims.  *See K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Patent Examiners had experience in the field of the invention, and that the Patent Examiners properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).

32.     The claims of the Decapolis Patents are novel and non-obvious, including over all non-cited art that is merely cumulative with the referenced and cited prior art.  *See* 37 C.F.R. § 1.56(b) (information is material to patentability when it is not cumulative to information already of record in the application); *see also AbbVie Deutschland GmbH v. Janssen Biotech,* 759 F.3d 1285, 1304 (Fed. Cir. 2014); *In re DBC,* 545 F.3d 1373, 1382 (Fed. Cir. 2008).  Likewise, the claims of the Decapolis Patents are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by the Examiners.  *See, e.g., St. Clair I.P. Consultants v. Canon, Inc.,* 2011 WL 66166 at *6 (Fed. Cir. 2011); *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002); *In re Koninklijke Philips Patent Litigation,* 2020 WL 7392868 at *19 (N.D. Cal. 2020); *Standard Oil v. American Cyanamid,* 774 F.2d 448, 454 (Fed. Cir. 1985) (persons of ordinary skill are presumed to be aware of all pertinent prior art).

33.     The claims of the Decapolis Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir.

2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286.") (internal citations omitted).

## THE ACCUSED INSTRUMENTALITIES

34.     Upon information and belief, MedSys makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of electronic healthcare systems, platforms and services, including but not limited to Cerner Corporation's cloud-based electronic health records ("EHR") and practice management system and software for patients, payers, health registries, and insurers. MedSys offers, among other things, a cloud database and framework to receive and send data and messages, fill orders, manage patient care, referrals, admissions, scheduling, check-in, e-prescriptions, discharge, billing, accounting, collections, security, payroll, materials management, practice analytics, revenue management, and reporting. It includes features as shown below in Figure 1, including all augmentations to these platforms or descriptions of platforms.

**Plano, Texas – Oct. 3, 2018** – MedSys Group announced today it is joining Cerner, a global leader in healthcare technology, and innovators to help make seamless care available to the nation's veterans. This newly formed team announced by Cerner v experience in large enterprise systems and commercial sectors to modernize the U.S. Department of Veterans Affairs (VA) electronic health record
 *"MedSys Group is extremely honored to be part of this program and serve such a deserving population as our veterans.  MedSys' focus will be to enhance the training and support functions of the project, as well as contribute to the clinical transformation and end user adoption as the program is rolled out.  Our team is thrilled to be part of this historic initiative alongside Cerner and the partnership".*
– *Mark Embry, MedSys Group Co-Founder*

Apply Online

**Figure 1 – Screenshot of MedSys' webpage for Cerner EHR and its features as visited on May 12, 2022 and located at** https://medsysgroup.com/medsys-group-joins-cerner-technology-and-system-integration-leaders-to-modernize-veterans-electronic-health-records/.

---

## CERNER PRACTICE

MedSys Group has been in the healthcare information technology (HIT) business since 1995, providing an integrated offering of recruiting services, contract-to-hire and contracted experts. In 2012, we added a full suite of advisory services in an effort to meet the growing market demand for services that help organizations formulate and execute plans to achieve strategic goals. While this makes our advisory and implementation services a newer offering for our firm, these employees were specifically chosen because of their extensive industry experience, client-centered focus and fit with MedSys' unique culture. This approach has served us well, resulting in a top KLAS ranking for IT Advisory Services and Implementation Staffing.

The size of our firm makes us agile, enabling us to tailor our service offerings to meet our clients' needs. However, we are committed to only accepting engagements that are firmly within our area of expertise, align with our culture and beliefs and ultimately serve the best interests of our prospective clients.

Our Cerner consulting staff has deep knowledge of Cerner's implementation methodology and can more effectively prepare clients for implementation by helping design the project framework and governance structures that align with Cerner's methodology – all before Cerner's project team fully

**Figure 2 – Screenshot of MedSys' webpage for Cerner EHR and its features as visited on May 12, 2022 and located at https://medsysgroup.com/cerner-practice/.**

35.     Upon information and belief, Tenet makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of electronic healthcare systems, platforms and services, including but not limited to Cerner Corporation's cloud-based electronic health records ("EHR") and practice management system and software for patients, payers, health registries, and insurers. Tenet offers, among other things, a cloud database and framework to receive and send data and messages, fill orders, manage patient care, referrals, admissions, scheduling, check-in, e-prescriptions, discharge, billing, accounting, collections, security, payroll, materials management, practice analytics, revenue management, and reporting. It includes features as shown below in Figure 3, including all augmentations to these platforms or descriptions of platforms.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    10

**Tenet Healthcare**



At the time of its 2012 Cerner EHR implementation, Tenet was operating 49 hospitals and implemented the Cerner EHR system at 47 of those inpatient hospitals.

Today, Tenet operates nearly 87 hospitals, 19 short-stay surgical hospitals, over 425 outpatient centers, all operated by more than 130,000 employees. Operating on pillars of quality, integrity,

**Figure 3 – Screenshot of healthcare media's webpage for Tenet's use of Cerner's cloud based EHR and its features as visited on May 12, 2022 and located at https://ehrintelligence.com/news/10-biggest-cerner-ehr-implementations-in-united-states.**

36.     Upon information and belief, UHS makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of electronic healthcare systems, platforms and services, including but not limited to Cerner Corporation's cloud-based electronic health records ("EHR") and practice management system and software for patients, payers, health registries, and insurers. UHS offers, among other things, a cloud database and framework to receive and send data and messages, fill orders, manage patient care, referrals, admissions, scheduling, check-in, e-prescriptions, discharge, billing, accounting, collections, security, payroll, materials management, practice analytics, revenue management, and reporting. It includes features as shown below in Figure 4, including all augmentations to these platforms or descriptions of platforms.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

11

**Universal Health Services**



As a major health system, Universal Health Services operates in nearly 235 acute care and behavioral health facilities in 37 states. These facilities employ over 70,000 people.

In 2012, UHS adopted Cerner EHR systems in both its inpatient and ambulatory facilities, helping to improve care quality and patient safety across UHS's facilities.

Within the past year, UHS facilities have been recognized for their care quality by The Joint Commission, highlighting the health system's ability to utilize health IT to drive quality measures.

**Figure 4 – Screenshot of healthcare media's webpage for UHS' use of Cerner's cloud based EHR and its features as visited on May 12, 2022 and located at https://ehrintelligence.com/news/10-biggest-cerner-ehr-implementations-in-united-states.**

37.     Upon information and belief, TTI makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of electronic healthcare systems, platforms and services, including but not limited to Cerner Corporation's cloud-based electronic health records ("EHR") and practice management system and software for patients, payers, health registries, and insurers. TTI offers, among other things, a cloud database and framework to receive and send data and messages, fill orders, manage patient care, referrals, admissions, scheduling, check-in, e-prescriptions, discharge, billing, accounting, collections, security, payroll, materials management, practice analytics, revenue management, and reporting. It includes features as shown below in Figure 5, including all augmentations to these platforms or descriptions of platforms.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    12



**Tyler Technologies and Cerner Support Improved Medicaid Reporting for State Health Departments**

*Tyler's Entellitrak platform is able to replace and automate a largely manual process*

September 01, 2020 09:17 AM Eastern Daylight Time

PLANO, Texas--(BUSINESS WIRE)--Tyler Technologies, Inc. (NYSE: TYL) today announced that it has signed an agreement with Cerner Corporation (NASDAQ: CERN), a global health care technology company, to help state health departments more efficiently complete federally mandated Medicaid reporting with Tyler's Entellitrak® platform.

.@tylertech and Cerner will help state health departments more efficiently complete federally mandated Medicaid reporting.

🐦 Tweet this

Tyler and Cerner have the opportunity to provide a solution that helps sta health departments and agencies streamline manual reporting and secure critical federal funding through their states' Medicaid systems. Cerner's *HealtheIntent*® population health platform already helps manage Medicai programs and, with the addition of Tyler's comprehensive reporting platform Entellitrak, current and future clients may be supported to solve data management and reporting challenges for these statewide programs

**Figure 5 – Screenshot of TTI's press release for its use of Cerner's cloud based EHR and its features as visited on May 12, 2022 and located at**
https://www.businesswire.com/news/home/20200901005053/en/Tyler-Technologies-and-Cerner-Support-Improved-Medicaid-Reporting-for-State-Health-Departments.

38.   Collectively, all the foregoing is referred to herein as the "Accused instrumentalities."

### COUNT I
### Infringement of U.S. Patent No. 7,490,048

39.   Plaintiff incorporates the above paragraphs by reference.

40.   Defendants have been on actual notice of the '048 Patent at least as early as the date it received service of the Original Complaint in this litigation.

41.   The damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

42.   Upon information and belief, Defendants own, direct, and/or control the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

43.   Upon information and belief, Defendants have directly infringed and continue to directly infringe at least Claims 1, 2, 10, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                        13

37, 38, 39, and 40 of the '048 Patent.  As exemplary, Claim 20 is by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities.  Defendants directly make the infringing Accused Instrumentalities at least because they are solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom.  More specifically, and on information and belief, with respect to the Accused Instrumentalities, Defendants: (i) executed contracts with third party servicers for the provision of archival services and databases for healthcare and related records and/or designed and assembled such archival services and databases using its own employees and/or contractors; (ii) developed, own, and maintain digital storage archives for healthcare and related records; (iii) provide access to such records via its own branded Internet domains and/or software applications using its own name and business trade dress; (iv) exercise authority over the provision of such record archival services and databases; (v) openly advertise and promote such record archival services and databases bearing its name and business trade dress to customers in the United States; (vi) authored or commissioned the preparation of computer code for accessing and retrieving stored and/or archived healthcare records via its Internet domain web pages and/or software applications; (vii) claim ownership and control over such stored and/or archived healthcare records by virtue of its corporate branding and the provision of direct access; and (viii) receive monetary benefits from the provision of such healthcare records storage, archival, and retrieval services to customers.

44.     Further on information and belief, Defendants directly use the infringing Accused Instrumentalities at least because they assembled the combined infringing elements and makes them collectively available in the United States, including via their Internet domain

web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Defendants have directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  Such testing and/or legal compliance necessarily requires Defendants to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendants are direct infringers by virtue of their branding and marketing activities, which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

45.   More specifically, and on information and belief, Defendants are making, using, and offering for sale a computer-implemented method, identified as the Accused Instrumentalities, comprising: receiving information regarding a restriction or limitation regarding an ability of a person or an entity to at least one of access, obtain, change, alter, and modify, information contained in an individuals or patients healthcare record or an individual's or patients healthcare file, wherein the individuals or patient's healthcare record or the individuals or patient's healthcare file contains healthcare information or healthcare-related information personal to the individual or patient.

46.   As Figures 1-5 shows above, Defendants are making, using, and offering for sale a computer-implemented method and apparatus, identified as the Accused Instrumentalities.

47.   Additionally, the Accused Instrumentalities are specially configured such that they perform a method wherein the restriction or limitation contains information regarding at least one of a healthcare provider, a healthcare payer, a healthcare insurer, and an authorized entity, and information regarding a designated purpose for allowing each of the at least one of a healthcare provider, a healthcare payer, a healthcare insurer, and an authorized entity, to at

least one of access, obtain, change, alter, and modify, the information contained in an individuals or patients healthcare record or an individual's or patient's healthcare file, wherein the designated purpose is at least one of to perform a diagnosis, to perform a diagnosis for a certain ailment, illness, or symptom, to provide a second opinion, to verify or disprove a condition or a pre-existing condition, to submit an insurance claim, and to process an insurance claim.

48.  Defendants' infringing methods each separately, are storing the information regarding a restriction or limitation regarding an ability of a person or an entity to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's healthcare file; processing, with a processor, a request by a person or an entity to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's healthcare file; determining, using the information regarding the restriction or limitation, whether the person or the entity is allowed or authorized to at least one of access, obtain, change, alter, and modify, the information contained in an individual's or patient's healthcare record or an individuals or patient's healthcare file; generating a message containing at least one of information regarding the person or the entity making the request, and identification information regarding the person or the entity making the request, and further wherein the message contains an actual change, alteration, or modification, made to the information contained in an individual's or patients healthcare record or an individuals or patient's healthcare file; and transmitting the message to a communication device of the individual or patient via, on, or over, a communication network.

49.     Additionally, upon information and belief, Defendants own, direct, and/or control the infringing method operation of the Accused Instrumentalities that includes wherein the message is transmitted to the communication device of the individual or patient at least one of during, concurrently with, at a same time as, and prior to a completion of an at least one of an accessing, an obtaining, a changing, an altering, and a modifying, of the information contained in an individuals or patient's healthcare record or an individual's or patients healthcare file by the person or the entity, or at least one of during, concurrently with, at a same time as, and prior to a completion of a processing of the request to at least one of access, obtain, change, alter, and modify, the information contained in an individuals or patient's healthcare record or an individual's or patient's health care file.

50.     On information and belief, the infringement of the Decapolis Patents by Defendants will now be willful through the filing and service of this Complaint.

51.     In addition or in the alternative, Defendants now have knowledge and continue these actions and indirectly infringe by way of inducing direct infringement by others and/or contributing to the infringement by others of the '048 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of at least Claims 1, 2, 10, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 of the '048 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Defendants injured Decapolis and is thus liable to Decapolis for infringement of the '048 Patent under 35 U.S.C. § 271.

52.     Now with knowledge of the Decapolis Patents, Defendants induce infringement under Title 35 U.S.C. § 271(b).  Defendants will have performed actions that induced infringing acts that Defendants knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc*., 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement—either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co*., 501 F.3d 1307, 1313, (Fed. Cir. 2007).

53.     Plaintiff will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd*., 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

54.     Defendants have taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

55.     In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Defendants have a practice of not performing a review of the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

patent rights of others first for clearance or to assess infringement thereof prior to launching products and services.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

56.     The foregoing infringement on the part of Defendants have caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Decapolis Patents.

57.     Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 7,464,040**

58.     Plaintiff incorporates the above paragraphs by reference.

59.     Defendants have been on actual notice of the '040 Patent at least as early as the date it received service of the Original Complaint in this litigation.

60.     The infringement damages period begins at least as early as six years prior to the date of service of the Original Complaint in this litigation.

61.     The '040 patent application claims the benefit of priority of U.S. Provisional Patent Application Ser. No. 60/286,422, filed April 25, 2001, titled "APPARATUS AND METHOD FOR PROCESSING AND/OR FOR PROVIDING HEALTH CARE INFORMATION AND/OR HEALTHCARE-RELATED INFORMATION," the subject matter and teachings of which are hereby incorporated by reference herein.

62.     Upon information and belief, Defendants own, direct, and/or control the operation of the Accused Instrumentalities and generates substantial financial revenues and benefits therefrom.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                    19

63.  Upon information and belief, Defendants have directly infringed and continue to directly infringe at least Claims 1 and 46 of the '040 Patent by making, using, importing, selling, and/or offering for sale the Accused Instrumentalities.  Defendants directly make the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing systems into service by directing or controlling the systems as a whole and by obtaining the benefits therefrom.  More specifically, and on information and belief, with respect to the Accused Instrumentalities, Defendants: (i) executed contracts with third party servicers for the provision of archival services and databases for healthcare and related records and/or designed and assembled such archival services and databases using its own employees and/or contractors; (ii) developed, own, and maintain digital storage archives for healthcare and related records; (iii) provide access to such records via its own branded Internet domains and/or software applications using its own name and business trade dress; (iv) exercise authority over the provision of such record archival services and databases; (v) openly advertise and promote such record archival services and databases bearing its name and business trade dress to customers in the United States; (vi) authored or commissioned the preparation of computer code for accessing and retrieving stored and/or archived healthcare records via its Internet domain web pages and/or software applications; (vii) claim ownership and control over such stored and/or archived healthcare records by virtue of its corporate branding and the provision of direct access; and (viii) receive monetary benefits from the provision of such healthcare records storage, archival, and retrieval services to customers.

64.  Further on information and belief, Defendants directly uses the infringing Accused Instrumentalities at least because they assembled the combined infringing elements and makes them collectively available in the United States, including via their Internet domain

web pages and/or software applications, as well as via its internal systems and interfaces. Further, and on information and belief, Defendants have directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.   Such testing and/or legal compliance necessarily requires Defendants to make and use the Accused Instrumentalities in an infringing manner.   Still further, Defendants are a direct infringer by virtue of their branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.

65.     More specifically, and on information and belief, the Accused Instrumentalities, each separately, receives information regarding an individual, wherein the information regarding an individual is transmitted from a first computer or from a first communication device, wherein the first computer or the first communication device is associated with a healthcare provider, wherein the information regarding an individual is transmitted via, on, or over, at least one of the Internet and the World Wide Web, wherein the information regarding an individual contains information regarding at least one of a symptom, an examination finding, a diagnosis, a treatment, an administration of a treatment, and a procedure; a database or a memory device, wherein the database or the memory device is associated with the receiver and is located at a location remote from the first computer or remote from the first communication device, wherein the database or the memory device stores information regarding a plurality of individuals, a plurality of healthcare providers, and a plurality of healthcare insurers or healthcare payers.

66.     The Accused Instrumentalities each separately, use the information regarding a plurality of individuals, a plurality of healthcare providers, and/or a plurality of healthcare insurers or

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

21

healthcare payers, which includes a healthcare record or a healthcare history of, for, or associated with, each individual of a plurality of individuals, along with a healthcare record or a healthcare history of, for, or associated with, the individual, information regarding a healthcare practice of, and an insurance accepted by, each of the plurality of healthcare providers, including information regarding a healthcare practice of, and an insurance accepted by, the healthcare provider, information for processing or for storing information regarding a healthcare diagnosis or a healthcare treatment, and information for submitting an insurance claim to a healthcare insurer or a healthcare payer associated with the individual.

67.    Upon information and belief, Defendants own, direct, and/or control the operation of the Accused Instrumentalities that includes a processing device, wherein the processing device processes the information regarding an individual, and further wherein the processing device processes information for at least one of storing the information regarding an individual in the database or the memory device and updating the healthcare record or the healthcare history of, for, or associated with, the individual, and further wherein the processing device automatically generates an insurance claim in response to the storing of the information regarding an individual in the database or the memory device or the updating of the healthcare record or the healthcare history of, for, or associated with, the individual, wherein the insurance claim is suitable for being automatically submitted to the healthcare insurer or the healthcare payer associated with the individual or is suitable for being automatically transmitted to a second computer or to a second communication device, wherein the second computer or the second communication device is associated with the healthcare insurer or the healthcare payer associated with the individual, and further wherein the processing device transmits the insurance claim to the second computer or to the second communication device.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                22

68.     As Figures 1-5 shows above, Defendants are making, using, and offering for sale a computer-implemented method and apparatus, identified as the Accused Instrumentalities.

69.     On information and belief, the infringement of the Decapolis Patents by Defendants is now willful and continues to be willful through the filing and service of this Complaint.

70.     In addition or in the alternative, now with knowledge of the Decapolis Patents, Defendants induce direct infringement by others and/or contributing to the infringement by others of the '040 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, infringing services for use in systems that fall within the scope of at least Claims 1 and 46 of the '040 Patent. This includes without limitation, one or more of the Accused Instrumentalities by making, using, importing offering for sale, and/or selling such services, Defendant injured Decapolis and is thus liable to Decapolis for infringement of the '040 Patent under 35 U.S.C. § 271.

71.     Defendants now actively induce infringement under Title 35 U.S.C. § 271(b).  Defendants' actions induce infringing acts that Defendants knew or should have known would induce actual infringements. *See Manville Sales Corp. v. Paramount Sys., Inc*., 917 F.2d 544, 553 (Fed.Cir.1990), quoted in *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1306 (Fed.Cir.2006) (*en banc* in relevant part). "[A] finding of inducement requires a threshold finding of direct infringement—either a finding of specific instances of direct infringement or a finding that the accused products necessarily infringe." *Ricoh,* 550 F.3d at 1341 (citing *ACCO Brands, Inc. v. ABA Locks Manufacturer Co*., 501 F.3d 1307, 1313, (Fed. Cir. 2007).

72.     Plaintiff will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    23

may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

73.     If Defendants continue these actions as of this Complaint, Defendants will have taken active steps to induce infringement, such as advertising an infringing use, which supports a finding of an intention for the accused product to be used in an infringing manner. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) (explaining that the contributory infringement doctrine "was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement").

74.     In addition, on information and belief, and based in part upon the clear infringement by the Accused Instrumentalities, Defendants have a practice of not performing a review of the patent rights of others first for clearance or to assess infringement thereof prior to launching products and services.  As such, Defendants have been willfully blind to the patent rights of Plaintiff.

75.     The foregoing infringement on the part of Defendants have caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Decapolis Patents.

76.     Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

\\\

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                            24

**PRAYER FOR RELIEF**

WHEREFORE, Decapolis Systems, LLC respectfully requests the Court enter judgment against Defendants as follows:

1.      Declaring that Defendants have infringed each of the Decapolis Patents;

2.      Awarding Decapolis Systems, LLC its damages suffered because of Defendants' infringement of the Decapolis Patents;

3.      Enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendants' willful infringement of one or more of the Decapolis Patents;

4.      Awarding Decapolis Systems, LLC its costs, reasonable attorneys' fees, expenses, and interest; and

5.      Granting Decapolis Systems, LLC such further relief as the Court finds appropriate.

**JURY DEMAND**

Decapolis Systems, LLC demands trial by jury, under Fed. R. Civ. P. 38.

Respectfully Submitted

*/s/ Randall Garteiser*
M. Scott Fuller
   Texas Bar No. 24036607
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   rgarteiser@ghiplaw.com
Christopher A. Honea
   Texas Bar No. 24059967
   chonea@ghiplaw.com
René A. Vazquez
   Virginia Bar No. 41988
   rvazquez@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (903) 405-3999

**ATTORNEYS FOR PLAINTIFF
DECAPOLIS SYSTEMS, LLC**